## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### WESTERN DIVISION

Michael Anthony Cage,

        Plaintiff,

    v.

Tarry Williams, *et al.*

        Defendants.

Case No.: 23-cv-50351

Judge Iain D. Johnston

## MEMORANDUM OPINION AND ORDER

The concept of proportionality is central to our rule of law. Proportionality extends back to the Magna Carta and the rebel barons' grievances against King John. Magna Carta, ch. 20–22 (1215). The concept is likewise contained in Captain Hector Barbossa's rally to his crew in *Pirates of the Caribbean: The Curse of the Black Pearl. Pirates of the Caribbean: The Curse of the Black Pearl*, Disney+, at 1:10:23 (Walt Disney Pictures 2003). Proportionality is critical under both the Fourth and Eighth Amendments to the United States Constitution. *Graham v. Florida*, 560 U.S. 48, 59 (2010); *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 863 (7th Cir. 2010). And proportionality is an integral part of civil discovery. Fed. R. Civ. P. 26(b)(1). Importantly, for purposes of the pending motion, proportionality is central to determining discovery sanctions. *Williams v. Adams*, 660 F.3d 263, 265 (7th Cir. 2011).

Defendants' repeated requests for dismissal as a sanction on the current record is disproportionate. Perhaps, after an evidentiary hearing, it may turn out

that dismissal is proportionate to the alleged misdeeds identified in the motion. But due process requires that this determination await the findings made after the parties are heard.

* * *

Plaintiff Michael Anthony Cage was a prisoner at Dixon Correctional Center in Dixon, Illinois. He has sued medical providers and Wexford Health Sources, Inc., alleging several violations of the Eighth Amendment arising from Defendants' alleged failure to provide adequate medical care when he was in custody. Now before the Court is Defendants' motion for sanctions under Rule 11 and Rule 37. For the reasons below, the motion is granted, in part, as follows.

## Background

Cage filed this action on September 19, 2023. He named Warden Tarry Williams, Dr. Larry Sy, Dr. Merril Zahtz, Nurse Grossman, and Wexford Healthsources, Inc. as defendants. Dkt. 1. The Court allowed Cage to proceed *in forma pauperis* but dismissed Warden Williams and Nurse Grossman at screening. Dkt. 8. The Court assigned counsel to represent Cage because of the potentially complex medical issues involved in this action. Dkt. 33. On April 1, 2025, Cage filed an Amended Complaint, relating to his care after a slip and fall. Dkt. 48. In the amended complaint, among other things, Cage alleged that he was improperly denied a Magnetic Resonance Image test. According to the amended complaint, because of Defendants' deliberate indifference, Cage has a tear and moderate degenerative disease in his right shoulder, a displaced and compressed spinal cord,

2

and blood clots in his hands. The amended complaint alleged that Cage's permanent injuries included his inability to feed, dress, clean, or relieve himself without assistance. Cage's counsel later claimed that including this allegation was a "scrivener's error."

At some point after Cage filed this complaint, Defendants' counsel not only reviewed Cage's Instagram account, but also copied a video from that account. Apparently, the Instagram video copied from Cage's Instagram account depicts Cage engaged in a variety of physical activities.

On June 26, 2025, Defendants' counsel deposed Cage. Under oath, he testified about several matters including his physical capabilities and employment. In short, during the June deposition, Cage portrayed his physical capabilities as extremely limited. The deposition was continued to a later date. At the conclusion of the June deposition, Defendants' counsel instructed Cage to preserve any social media accounts he had.

Defendants also hired a private investigation firm (Clutter Investigations) to investigate Cage's activities. In the process of investigating Cage, videos of Cage were taken. Those videos have been provided to the Court. The person in the video (which Cage doesn't dispute his him) can best be described as spry, and, in some critical respects, contradicts Cage's testimony during the June deposition.

Despite the instruction to preserve his social media, the Instagram video that Defendants' counsel saw and copied was deleted from Cage's Instagram account.

3

Cage's deposition resumed on July 10, 2025. During the resumed deposition, Cage provided testimony that contradicted his testimony from the June deposition. Here's a troubling example. In the June deposition, Cage testified that he couldn't lift a shovel, and, indeed, he wouldn't even attempt to lift a shovel. But in the resumed deposition in July, not only did Cage testify to using a shovel to work on his home but also testified that he never said that he would never use a shovel.

Defendants filed a motion for Rule 11 and Rule 37 sanctions on November 13, 2025. Dkt. 69. Cage responded. Dkt. 76. And Defendants replied. Dkt. 79. So, the matter is fully briefed.

After Cage was deposed, on December 22, 2025, Cage filed a Second Amended Complaint. Dkt. 78. Bizarrely, in the face of a Rule 11 sanctions motion, this pleading contained allegations contrary to Cage's sworn deposition testimony.

## Analysis

Defendants' motion for sanctions identifies three issues: (1) frivolous allegations in Cage's complaints, (2) Cage's false or misleading testimony during his deposition, and (3) the potential destruction of electronically stored information (ESI). The Court takes each in turn.

### i.    *The Complaints*

The first amended complaint alleges that Cage has blood clots in his hands and suffered "permanent physical injuries (degenerative disease in his right shoulder, an inability to feed, dress, clean, or relieve himself without assistance, trouble walking and the need of a wheelchair for mobility, and the potential loss of

4

his left leg)." Dkt. 48 ¶¶ 97, 112. The complaint also alleges that Dr. Larry Sy determined on May 7, 2024, that Cage "was unable to feed, dress, clean, or relieve himself without assistance." *Id.* at ¶78. Cage alleges that his health problems cause him "to be bound to a wheelchair because there are times he cannot walk at all." *Id.* at ¶90. With the lone exception of excluding the allegation that he is unable to feed, dress, clean, or relieve himself without assistance, Cage repeats these allegations in the Second Amended Complaint. *See* dkt. 78 ¶112.

For Rule 11 purposes, a frivolous argument is one that is "baseless or made without a reasonable and competent inquiry." *Berwick Grain Co., Inc. v. Ill. Dept. of Agriculture*, 217 F.3d 502, 504 (7th Cir. 2000) (quoting *Independent Lift Truck Builders Union v. NAACO Materials Handling Group, Inc.*, 202 F.3d 965, 969 (7th Cir. 2000)). "Frivolous," however, is not synonymous with "unsuccessful" or "unlikely to succeed." *Dolin v. GlaxoSmithKline LLC*, 951 F.3d 882, 887 (7th Cir. 2020).

At least one statement is plainly frivolous. Cage testified in his deposition that he didn't have blood clots in his hands. Dkt. 69, Ex. 1-126. Despite this clear admission, strangely, Cage still repeated this allegation post-deposition in the second amended complaint. Dkt. 78 ¶97.

Also bordering on frivolous is the allegation that Cage couldn't feed, dress, clean, or relieve himself without assistance. Cage removed the allegation from the second amended complaint because its inclusion in the first complaint was

5

purportedly a scrivener's error. Dkt. 66. Cage has testified that he has never had any issues feeding himself. Dkt. 69, Ex. 1-93-94.

Other statements in the complaints are less plainly frivolous. The allegation that "*Sy determined* that Cage was unable to feed, dress, clean, or relieve himself without assistance" is distinct from the allegation that Cage couldn't do those things. Although Dr. Sy did complete an evaluation form indicating that Cage was able to clean and feed himself, Cage testified in his deposition that Dr. Sy told him directly that he could not feed himself, brush his teeth, or take care of himself. Dkt. 69, Ex. 1-96; Ex. 2-17. The allegation that Dr. Sy told Cage he couldn't clean, feed, or take care of himself might not be true given the contradictory statement on the evaluation form, but Cage's testimony indicates that there is at least some basis for including it in the complaint.

What's more, Defendants take issue with Cage's allegation that he is "bound to a wheelchair because there are times he cannot walk at all." Dkt. 78 ¶90. Starting with the obvious, this allegation is internally inconsistent if one understands "bound to a wheelchair" as it is commonly understood. In common parlance, if someone is "bound to a wheelchair" they are probably a permanent or a long-term user of a wheelchair.[1] Given the evidence of Cage's mobility and testimony, Cage probably doesn't satisfy this "classic" definition. But there is at least some evidence that Cage has used a wheelchair at different times since his

---

[1] The Court takes no position on the appropriateness of this terminology more generally. *See* Tony Trott, Don't Say "Wheelchair Bound," New Mobility (Sept. 4, 2015), https://newmobility.com/dont-say-wheelchair-bound/.

6

injury. Dkt. 69, Ex. 2-21. Cage's use of the word "bound" is dramatic and disingenuous. And this hyperbole certainly affects his credibility. But it's not a frivolous statement worthy of sanctions.

Ultimately, the complaints only contain one frivolous statement . The Court will strike the allegation that Cage has blood clots in his hands from the complaint. Cage is precluded from asserting this allegation in the future. Other sanctions would be greater than necessary to deter misconduct. Fed. R. Civ. P. 11(c)(4). In short, they'd be disproportionate. But the inclusion of the other questionable allegations informs the Court regarding Cage's veracity.

ii. *False or Misleading Statements During the Depositions*

Defendants first took Cage's deposition on June 26, 2025, and engaged in the following colloquy:

- Q: How many steps does the house have to say get into the house?
  - o A: It's four to get into the house, but I got a ramp.
- Q: Do you have any like side hustles or business ventures?
  - o A: No.
- Q: When -- if you had to walk say ten feet, would you use the cane?
  - o A: Yes.
- Q: Do you ever take steps without using a cane?
  - o A: No.
  Q: never?
      A: No.
- Q: Do you think you could still do construction now?
  - o A: No way. No.
- Q: So you couldn't say like lift up a shovel and do any shoveling?
  - o A: No. Not even going to attempt to.
- Q: Are you able to lift any construction materials say like –
  - o A: No.
- Q: wood or
  - o A: No.
- Q: Cinder blocks?
  - o A: No.

- Q. No[?]
  - A: Wouldn't even attempt to. No.

At Cage's second deposition on July 10, 2025, Cage first denied having social media accounts besides Facebook and WhatsApp before finally admitting to having an Instagram account. Under oath, he denied ever posting a video on Instagram, but he admitted to making the video Defendants' counsel had downloaded. He admitted to deleting the video from his phone but denied removing it from his Instagram account. Curiously, he contends he didn't know how the video made its on to his Instagram account, hinting that perhaps a family member posted the video to his Instagram account. Cage also explained that he made and sold meals as a street vendor. He also denied saying that he would never attempt steps without a cane and admitted to using steps to enter and exit his home for at least two months. He admitted to using a shovel to work on his home and denied ever saying that he would never use a shovel.

In addition to the Instagram video, Defendants hired a private investigator to obtain evidence about Cage's claims. The investigator recorded videos, provided to the Court, that depict an individual walking around outside without a cane, lifting tools, and lifting and climbing a ladder. Cage doesn't dispute that the person depicted in the video is him.

For his part, Cage doesn't argue that his statements are accurate. Instead, he argues that Rule 11 isn't an appropriate basis for sanctions for this conduct. Dkt. 76. Cage is right that Rule 11 doesn't sanction conduct during a deposition.

But lying under oath in a sworn deposition is serious. A court has inherent power to sanction a party for the abuse of the judicial process. *Fuery v. City of Chicago*, 900 F.3d 450, 463 (7th Cir. 2018). Although not seemingly incorporated into the text of Rule 37, that rule might provide sanction authority, too. *See Ramirez v. T&H Lemont, Inc.*, 845 F.3d 772, 776 (7th Cir. 2016) ("We have construed the sanctioning power conveyed by Rule 37 to extend to instances of a party hiding evidence and lying in his deposition.") (*citing Negrete v. Nat'l R.R. Passenger Corp.*, 547 F.3d 721, 723-24 (7th Cir. 2008)). Perjury is an abuse of the judicial process. *Jackson v. Murphy*, 468 Fed. Appx 616, 619-20 (7th Cir. 2012).

Perjury is (1) false testimony under oath about a (2) material matter that is (3) made willfully. *United States v. Savage*, 505 F.3d 754, 762 (7th Cir. 2007). Dismissal of an action *can be* an appropriate sanction for perjury. *Jackson v. Murphy,* 468 Fed.Appx. 616, 619-620 (7th Cir. 2012). A statement is material if it's "designed to substantially affect the outcome of the case" at the time it's made. *Flextronics Int'l, USA, Inc. v. Sparkling Drink Sys. Innovation Ctr. Ltd.*, 230 F. Supp. 3d 896, 909 (N.D. Ill. 2017) (quoting *United States v. Galbraith*, 200 F.3d 1006, 1014 (7th Cir. 2000)).

There is good evidence that Cage made false statements under oath. Setting aside the damning videos, Cage swore he would never use a shovel and then admitted to using one. *Compare* Dkt. 69, Ex. 1-120-121 *with* Dkt. 69, Ex. 2-44-45. He first testified he couldn't use steps without a cane and then admitted he had. *Compare* Dkt. 69, Ex. 1-115 *with* Dkt. 69, Ex. 2-39-40. Similarly, he testified that he

9

had no other employment (referred to as "side hustle") but then admitted he did as a street vendor. What's more, Cage doubled down on his false testimony, falsely testifying that that he didn't testify to certain facts. For example, despite testifying that he couldn't use a shovel, Cage not only testified that he used a shove, but also testified that he didn't testify that he couldn't use a shovel. These are not innocent errors (to use the language of the Seventh Circuit's pattern jury instruction). Instead, these false statements are material, going to—among other things—damages, which is a critical issue in this case. The testimony establishes clear intentional dishonesty, not confusion, inadvertence, or inarticulateness. The videos further establish Cage's dishonesty in his deposition.

The Court finds that Cage willfully gave false testimony in his deposition, allowing for possible sanctions. *Montano v. City of Chicago*, 535 F.3d 558, 563-64 (7th Cir. 2008). So, the question becomes what sanction, if any, is proportionate to this offense. *Bolt v. Loy*, 227 F.3d 854, 856 (7th Cir. 2000) ("The touchstone is proportionality."). Cage's false testimony was not so pervasive that it entirely corrupted the judicial process. *See Alexander v. Caraustar Indus., Inc.*, 930 F. Supp. 2d 947, 958 (N.D. Ill. 2013) (describing the plaintiffs' extensive perjury). Defendants' demand for dismissal is disproportionate for this false testimony. *See Allen v. Chicago Transit Auth.*, 317 F.3d 696, 703 (7th Cir. 2003). The Court is mindful that, if possible and appropriate, cases should be decided on the merits. *C.K.S. Engineers, Inc. v. White Mountain Gypsum Co.*, 726 F.2d 1202, 1205 (7th Cir. 1984). And Cage may be a malingerer and mythomaniac but, nevertheless, still

10

have been maltreated. *Allen*, 317 F.3d at 703. But perjury is serious business that can't go unpunished. *Secrease v. Western & Southern Life Ins. Co.*, 800 F.3d 397, 402 (7th Cir. 2015) ("[F]alsifying evidence to secure a court victory undermines the most basic foundations of our judicial system. If successful, the effort produces an unjust result. Even if it is not successful, the effort imposes unjust burdens on the opposing party, the judiciary, and the honest litigants who count on the court to decide their cases promptly and fairly.").

Generally, due process requires courts to give a party fair notice and an opportunity to be heard before imposing sanctions. *Santoyo v. City of Chicago*, 141 F.4th 1328, 1329 (7th Cir. 2025). But "the amount of process due varies according to the facts of each case and the deprivation at stake." *Id.* Cage's perjury is plainly demonstrated in the record, and no additional process is necessary. Likewise, Cage was fully on notice to the risk of sanctions for perjury from both the oath sworn before his deposition and the identification of the false statements in Defendants' briefing.

In the Court's discretion, the following proportionate sanctions will be imposed. First, Cage must pay for Defendants' costs incurred in hiring Clutter Investigations. Defendants must file the invoice by February 17, 2026. Cage must reimburse Defendants the amount of the invoice no later than March 6, 2026. Second, the videos obtained by Clutter Investigations and provided to the Court will be admitted into evidence at summary judgment and trial, if necessary. Third, if this action proceeds to trial, the Court will provide the following jury instruction:

"Before trial, Cage provided sworn testimony relevant to his case. Some of Cage's testimony was false. You can use this fact in determining whether Cage has met his burden of proof to establish liability, and what, if any, damages to impose."

### iii. The Attempted and Potential Destruction of ESI

Defendants deposed Cage twice. At the end of the first deposition session, Defendants' counsel began to ask Cage about his social media use. As the session ended,[2] Defendants' counsel specifically told Cage not to alter any social media accounts. Before the deposition session, Defendants' counsel had identified Cage's Instagram and downloaded a video from his account.

Notwithstanding this instruction, the video was deleted from Cage's account before the second deposition session. Nonetheless, Defendants still have access to the video. It hasn't been furnished to the Court. But, from what the Court can tell, the video images significantly contradict (if not completely undermine) Cage's purported assertions of physical limitations.

Rule 37(e) governs the destruction of ESI and has five prerequisites: "(1) the information must be ESI; (2) there must have been anticipated or actual litigation that triggers the duty to preserve ESI; (3) the relevant ESI should have been preserved at the time of the litigation was anticipated or ongoing; (4) the ESI must have been lost because a party failed to take reasonable steps to preserve it; and (5) the lost ESI cannot be restored or replaced through additional discovery." *DR Distribs., LLC v. 21 Century Smoking, Inc.*, 513 F. Supp. 3d 839, 958 (N.D. Ill. 2021)

---

[2] The parties dispute whether the deposition ended abruptly and whether the ending was unexpected. The Court doesn't wade further into this particular issue.

(citations omitted). In addition, the Court may order *curative measures* only if Defendants were prejudiced by Cage's actions and may impose *sanctions*, such as terminating sanctions (like dismissal or default judgment) or a remedial instruction only if Cage acted with the intent to deprive Defendants of the use of the ESI. *See id.* Defendants don't engage with Rule 37(e)'s required analysis. Instead, they stampede to a request for dismissal under Rule 37(e).

Obviously, at issue is whether any ESI was lost. Defendants acknowledge that they downloaded the video before Cage deleted it. So, they have it. In their reply brief, Defendants argue for the first time that they didn't have the ability to preserve the video's metadata once Cage deleted the video from Instagram and then from his phone. It's true that metadata is ESI and its loss is covered by Rule 37. *Taylor Made Express, Inc. v. Kidd,* No. 21 C 2903, 2024 U.S. Dist. LEXIS 9211, at *40-41 (N.D. Ill. Jan. 18, 2024). But there are two problems with this reply-brief revelation. First, Defendants don't even state what they believe the metadata might possibly show and how it's relevant to this case. For example, is there even an issue as to the time the video was created or posted, who created it, or its authenticity? Second, a reply brief isn't the appropriate place to raise an argument for the first time. *White v. United States*, 8 F.4th 547, 552 (7th Cir. 2021) ("[A]rguments raised for the first time in [a] reply brief are waived because they leave no chance to respond."). Because Defendants didn't argue that any ESI was lost in its motion for sanctions, Rule 37 isn't an appropriate vehicle for sanctions now.

But the Court is not toothless when an incompetent spoliator attempts—but fails—to destroy ESI. Long before the adoption of Rule 37(e) by the 2015 amendments, courts have addressed the phenomenon of incompetent spoliators. *See The Stephen Hart*, 22 F. Cas. 1253 (S.D.N.Y. 1863). A more recent discussion before the 2015 amendments can be found in *Victor Stanley, Inc. v. Creative Pipe, Inc.* 269 F.R.D. 497 (D. Md. 2010). Unsurprisingly, this leading opinion was decided by Judge Paul Grimm (ret.). This case involved the "gang that couldn't spoliate straight." *Id.* at 501. In *Victor Stanley*, Judge Grimm recognized the two main sources of authority to impose sanctions for spoliation of evidence: Rule 37 and inherent authority. *Id.* at 517. As recognized in *Victor Stanley*, inherent authority allows courts to preserve the integrity of the judicial process. *Id.* at 517. And the attempted destruction of information threatens the integrity of judicial proceedings, even if the evidence is not successfully destroyed. *Cat3, LLC v. Black Lineage, Inc.*, 164 F. Supp. 3d 488, 498 (S.D.N.Y. 2016). Under the unique facts of that case, Judge Grimm wisely chose to rely upon Rule 37(b)(2) to impose sanctions. *Victor Stanley*, 269 F.R.D. at 520.

Rule 37(e) is the sole source of authority to address the spoliation of ESI. *Snider v. Danfoss, LLC*, No. 15 CV 4748, 2017 U.S. Dist. LEXIS 107591, at *7 (N.D. Ill. July 12, 2017), *report and recommendation adopted*, No. 1:15-CV-04748, 2017 U.S. Dist. LEXIS 120190 (N.D. Ill. Aug. 1, 2017). Indeed, the Advisory Committee Notes assert that inherent authority can't be used to address the spoliation of ESI. Fed. R. Civ. P. 37(e) advisory committee note to the 2015 amendment.

14

But immediately after the adoption of the 2015 amendments, including Rule 37(e), big-brained commentators spotted and discussed the gap in Rule 37(e) involving incompetent spoliators. Gregory P. Joseph, *Rule 37(e): The New Law of Electronic Spoliation*, 99 Judicature 35, 36-7 (2015). If, despite a party's attempt, the ESI was not destroyed—meaning that it could be restored, replaced, or found elsewhere—then the curative measures and sanctions provided by Rule 37(e) were unavailable. *Id.* In those situations, courts should be allowed to rely on their inherent authority. *Id.*

In discussing the Advisory Committee Notes' prohibition on the use of inherent authority, Judge Grimm aptly noted the limits to that prohibition. "[I]nherent authority can't be used merely to circumvent Rule 37(e)." The Sedona Conference, *Commentary on Legal Holds, Second Edition: The Trigger & The Process*, 20 Sedona Conf. J. 341, 359 n.34 (2019). So, if Rule 37(e) doesn't apply because the ESI wasn't spoliated, the prohibition against using inherent authority doesn't apply.

These commentators were not alone. In *Cat3, LLC v. Black Lineage, Inc.*, 164 F. Supp. 3d 488 (S.D.N.Y. 2016), Judge James ("Jay") Francis (ret.) was faced with phenomenon of the incompetent spoliator. In *Cat3*, "In effect, the plaintiffs argue[d] that even if they [were] the 'gang that couldn't spoliate straight,' . . . they [could] not be sanctioned because their misdeeds were discovered and the information recovered." *Id.* at 497. Judge Francis' blunt response rejected this absurd assertion: "They are incorrect." *Id.* Judge Francis recognized the gap in Rule 37(e) but still

found that he had inherent authority to remedy the plaintiffs' behavior. *Id.* at 497 ("If, notwithstanding this reasoning, Rule 37(e) were construed not to apply to the facts here, I could nevertheless exercise inherent authority to remedy spoliation under the circumstances presented."); *Id.* at 498 ("Thus, sanctions would be available under the court's inherent authority even if Rule 37(e) did not apply.").

Nicely pulling all this together is the excellent article by Judge Francis and Eric P. Mandel, *Limits on Limiting Inherent Authority: Rule 37(e) and the Power to Sanction*, 17 Sedona Conf. J. 613, 653-59 (2016). This article concluded that when faced with an incompetent spoliator that avoided Rule 37(e) because the ESI wasn't spoliated, "the court could properly exercise its inherent powers to remedy any prejudice." *Id.* at 660.

Later, the Sedona Conference itself took the position that courts could use their inherent authority to sanction incompetent spoliators. The Sedona Conference, *Commentary on Legal Holds, Second Edition: The Trigger & The Process*, 20 Sedona Conf. J. at 359 n.34.

This Court proudly joins Judge Grimm, Judge Francis, Gregory Joseph, Eric Mandel, and the Sedona Conference in recognizing its inherent authority to address the phenomenon of the incompetent spoliator. In doing so, the Court recognizes that it should be cautious in exercising its inherent authority because, among other things, due process rights are implicated, especially when Defendants relied upon Rule 37(e), not inherent authority, to seek sanctions. Iain D. Johnston, *Federal*

16

*Courts' Authority to Impose Sanctions for Prelitigation or Pre-Order Spoliation of Evidence*, 156 F.R.D. 313, 325 (1994).

True enough, Defendants didn't move for sanctions under the Court's inherent power. But the Court needn't wait for a party to request sanctions under its inherent authority before considering them. *Fuery*, 900 F.3d at 468. However, given the dispute about the destruction of the video as well as the Court's *sua sponte* invocation of its inherent authority, due process requires notice and an opportunity to be heard. *Santoyo* 141 F.4that 1329. So, the Court is now giving Cage notice.

The Court is considering sanctions under its inherent authority. Videos don't magically disappear from social media platforms and Cage's deposition explanations are comical. According to Cage, he didn't post the video on his Instagram account, and he didn't delete the video from his Instagram account. What's more, how or why the video was deleted immediately after Defendants' counsel instructed Cage to preserve it remains unexplained.

The Court is also giving Cage an opportunity to be heard. On March 9, 2026, at 9:30 a.m., the Court will hold an evidentiary hearing in courtroom 5200 of the Stanley J. Roszkowski United States Courthouse, 327 South Church Street, Rockford, Illinois. Cage must be present for the evidentiary hearing as he will be testifying. His failure to attend the hearing will result in dismissal of this action with prejudice. At the hearing, Cage will be questioned—including by the Court— about, among other things, whether he contests the authenticity of the video that

17

Defendants downloaded from his Instagram account; who and how the video was posted on Cage's Instagram account; who else—if anyone—has access to his Instagram account, and if Cage contends that other persons have access to his account, then he should procure their presence at the evidentiary hearing so that they can testify under oath; whether somebody else posted the video to his Instagram account, and if that is Cage's position, who that person is, how that person obtained the video, how and why that person posted the video to Cage's account (Cage should likewise procure that person's presence at the evidentiary hearing); when, how and why the video was deleted from Cage's Instagram account, especially after he was on notice to preserve his social media; what efforts Cage made to preserve the video from his Instagram account; and what efforts have been made to preserve other ESI and tangible evidence relevant to this action.

To provide Cage with further notice, the Court is considering the following sanctions, among others: dismissing this action, precluding the introduction of evidence, barring witnesses (including expert witnesses), imposing attorneys' fees and costs, shifting and/or increasing the burdens of proof, and providing adverse jury instructions.

At the evidentiary hearing, in determining Cage's veracity, the Court will consider Cage's false statements in his complaints as well as his false deposition testimony. The Court is not required to turn a blind eye to these facts. If, at the hearing, Cage wishes to attempt to explain the false statements in the complaints and deposition testimony, the Court will hear what Cage has to say.

18

The obvious purpose of the evidentiary hearing is to obtain facts and determine Cage's mental state; namely, whether his actions were intentional, willful, or in bad faith. Only upon making those factual determinations after Cage is given the opportunity to present evidence will the Court be able to decide if sanctions are appropriate, and, if so, what those sanctions will be.

## Conclusion

For the reasons discussed above, Defendants' motion for sanctions is granted, in part, and denied, in part. First, Cage's allegation that he has blood clots in his hand is struck from the complaint, and he is barred from introducing any evidence that he had or has blood clots in his hand. Second, due to Cage's false deposition testimony, he must reimburse Defendants for the cost of the investigation; the video recording will be admitted at summary judgment and trial, if necessary; and the jury will be instructed as to his previous false testimony. Third, because of the destruction of the Instagram video, the Court will hold an evidentiary hearing to determine what, if any, additional sanctions should be imposed.

If Cage's recruited counsel believes she can no longer represent Cage under the Rules of Professional Conduct, counsel must file a motion to be relieved of the assignment by March 6, 2026.

Entered:  February 12, 2026

By: _____
Iain D. Johnston
U.S. District Judge